**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:15CV1068 |
| CAUSWAVE, INC., JEFFREY L. RIGGS, and DIANE R. BALDWIN, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Jeffrey L. Riggs's "Notice of

Motion to Vacate Order for Default Entered Against Him" [Doc. # 65], Plaintiff

Securities and Exchange Commission's Motion for Default Judgment as to

Defendant's CAUSwave, Inc. and Jeffrey L. Riggs [Doc. #67], and the Securities

and Exchange Commission's Motion to Dismiss with Prejudice All Claims Against

Defendant Diane R. Baldwin [Doc. #74].  As explained more fully below, Riggs's

Motion is denied, the Securities and Exchange Commission's Motion for Default

Judgment is granted, and the Securities and Exchange Commission's Motion to

Dismiss its claims against Baldwin is granted.

On December 16, 2015, the Securities and Exchange Commission ("SEC")

instituted this action against CAUSwave, Inc. ("CAUSwave"), Riggs, and Baldwin,

alleging that they variously committed fraud in violation of § 10(b) of the Exchange

Act (15 U.S.C. § 78j(b)), Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and

§ 17(a) of the Securities Act (15 U.S.C. § 77q(a)), registration violations prohibited

by §§ 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c)), and aided

and abetted such violations.  Over the course of the litigation, default was entered

against CAUSwave, (see Order [Doc. #52] & Entry of Default [Doc. #53]), and

Riggs, (see Order [Doc. #62] & Entry of Default [Doc. #63]).

I.

Riggs filed a "Notice of Motion to Vacate Order for Default Entered Against

Him as Ultra Vires, Done in Violation of Settled Principles of Law, Public Policy,

Aldrich v. Bowen, 130 F.3d 1364, 1365 (9th Cir. 1997), etc., and Other Settled

Law Cited Herein See: 28 U.S. Code § 636(C)(1)".  In this Notice, Riggs makes the

same arguments he has made in prior filings challenging the Magistrate Judge's

authority, (compare Notice at 3-6 [Doc. #65] with Def. Jeffrey L. Riggs's Aff. in

Opp'n ¶¶ 1-15 [Doc. #60] & Def. Jeffrey Riggs's Aff. in Resp. ¶¶ 1-14 [Doc.

#50]), which the Court has previously settled, (see Order [Doc. #62] & Order [Doc.

#52]).  He further argues that the Court "relied on an unlawful" finding of the

Magistrate Judge when it adopted the November 13, 2017 Recommendation with

modification and ordered the Clerk to enter default against Riggs.  However, Riggs

made the same arguments challenging the authority of the Magistrate Judge when

he objected to the Recommendation, which the Court reviewed before adopting the

Recommendation with modification and ordering entry of default.  Therefore, for

the reasons previously stated, (see Order [Doc. #62] & Order [Doc. #52]), Riggs's

motion is denied.

II.

Before addressing the SEC's motion for default judgment, its motion to dismiss claims against Baldwin is addressed because it disposes of the only party to this action other than CAUSwave and Riggs. Cf. Fed. R. Civ. P. 54(b) (providing "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, . . . parties only if the court expressly determines that there is no just reason for delay"). On March 21, 2018, counsel for Baldwin notified the Court of her death. (See [Doc. #64].) The SEC "consider[ed] what steps, if any, may be continued with respect to Ms. Baldwin", (SEC's Br. in Supp. at 3 n.2 [Doc. #68]), and "has determined it is appropriate to dismiss all claims against" her with prejudice, (SEC's Mot. to Dismiss at 1-2). Her former counsel and her son consent to the motion, while neither CAUSwave nor Riggs have responded to the SEC's request for consent. Based on the foregoing, the SEC's motion is granted.

III.

A.

The SEC also moves for default judgment against CAUSwave and Riggs pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. Because default has been entered against CAUSwave and Riggs, "the factual allegations of the complaint, except those relating to the amount of damages[1], will be taken as true."

---

[1] The SEC's initial support for its requested relief was insufficient. (See Order (July 6, 2018) [Doc. #71].) The SEC subsequently submitted additional explanation and

SEC v. Marker, 427 F. Supp. 2d 583, 586 (M.D.N.C. 2006). In April 2008, Riggs and Baldwin formed UTISA, Inc., which became CAUSwave later that year. (Compl. ¶ 16 [Doc. #1].) The company's ostensible purpose was to raise money to fund research and development of products using a self-described scientific process involving alternative energy conversion. (Id.) CAUSwave's website was publicly available and touted the company's technologies and had links for the public to contact the company. (Id. ¶ 17.) Riggs exercised control of CAUSwave by signing contracts on its behalf, directing payments from the corporate bank accounts, and drafting and issuing statements on its behalf. (Id. ¶ 18.)

Beginning in February 2009, Riggs and CAUSwave began raising money through the sale of shares of the company by word of mouth, phone calls, shareholder meetings, and regular, written updates typically sent via email ("Investor Updates"). (Id. ¶ 19.) The individual shareholders who purchased shares of CAUSwave received Class B, non-voting shares of CAUSwave for $600 per share. (Id. ¶ 20; see also Decl. of Elizabeth P. Skola ¶ 9 (noting that between February 2009 and approximately March 2015, CAUSwave issued approximately 14,972 shares of Class B non-voting stock to investors for $600 per share) (Apr. 10, 2018) [Doc. #68-2].) Between approximately February 2009 and approximately March 2015, CAUSwave raised approximately $8,983,200 in investor funds through the sale of these Class B shares. (Decl. of Skola ¶ 10.)

---

support for its requested relief. (See SEC's Resp. to Ct. Order (Sept. 19, 2018) [Doc. #73].)

In approximately August 2009, Riggs began communicating with a possible institutional investor regarding a potential investment in CAUSwave. (Compl. ¶ 22.)  This institutional investor represented that he could and would make a very large investment into CAUSwave once he secured funds from internationally-based third-parties who had access to large gold reserves, but he needed cash from CAUSwave in order to secure those funds. (Id.)  In response, between September 2009 and March 2015, Riggs sent approximately $500,000 of CAUSwave's investor money to this purported institutional investor, but never received any money from that investor or any other institutional investor. (Id. ¶ 23.)

Meanwhile, from March 2009 through at least April 2015, CAUSwave sent regular Investor Updates – drafted, finalized, and signed by Riggs – to its individual friends and colleague investors and prospective investors with information regarding, among other things, the company's fundraising efforts. (Id. ¶¶ 24, 25.) The Investor Updates included CAUSwave's November 23, 2011 statement that "today we received long awaited funds from our institutional investors" when, in fact, the company's bank accounts had combined balances of less than $100 on that date. (Id. ¶ 27.)  On March 19, 2014, Riggs advised investors that an institutional investor "has provided CAUSwave a second tranche of bridge funding/operating capital" when, in fact, as of March 2014 and all material times thereafter, CAUSwave had not received and did not receive money from any source other than the general individual investors. (Id. ¶ 28.)  Riggs repeatedly promised investors that, once the institutional investor funding was received,

investors would have the opportunity to sell their Class B shares back to CAUSwave for a price significantly higher than their original purchase price of $600. (Id. ¶ 29.) In the September 16, 2014 Investor Update, Riggs stated that "the investor's commitment to $70,000 per share at the time of buy-back remains firm" when he knew that CAUSwave had not received any funds from any institutional investor, nor any firm commitment to buy back the shares of the investors. (Id. ¶¶ 29, 30.) In addition, in the Investor Updates, CAUSwave and Riggs claimed that CAUSwave would be the recipient of grant funds and that the company would be involved in a $20 billion merger. (Id. ¶ 33.)

CAUSwave and Riggs failed to disclose to investors that CAUSwave had paid hundreds of thousands of dollars to institutional investors from whom it was seeking investment money and no institutional investor ever provided any investment funding. (Id. ¶ 31.) They failed to update or correct their prior statements to investors regarding the funding from institutional investors and continued to tell investors that the funds were imminent. (Id. ¶ 32.)

Throughout this time, CAUSwave's only source of money was from the sale of stock to individual investors; it had no revenue or income from operations at any time. (Id. ¶ 37; see also Decl. of Skola ¶ 11 (noting the only source of income was from the sale of stock to investors).) CAUSwave and Riggs continually represented to investors that the company intended to develop various technologies when, in fact, substantial investor funds were diverted to Riggs. (Compl. ¶ 38.) Between approximately August 2009 and approximately April

2015, CAUSwave paid at least $1,206,000 in consulting fees, loans, and unexplained payments to Riggs. (Decl. of Skola ¶ 12.) CAUSwave and Riggs failed to disclose to investors that substantial percentages of their investments were being diverted to Riggs. (Compl. ¶ 39.)

In addition, from 2009 until March 2015, Riggs and CAUSwave continuously offered and sold shares of stock in CAUSwave, including offers of shares via the Investor Updates, but made no attempt to restrict the sales of shares to investors from a single state or to ascertain whether potential purchasers were accredited investors. (Id. ¶ 34.) On or about June 2, 2014, CAUSwave filed a Form D with the SEC, claiming an exemption from registration and disclosing that, as of that date, the company had sold $4,427,575 of its securities to 298 non-accredited investors. (Id. ¶ 35.) Riggs signed the Form D in his capacity as President and Chief Executive Officer of CAUSwave. (Id.) The company has not registered any offerings of securities with the SEC. (Id. ¶ 36.)

1.

The factual allegations, taken as true here, support the conclusion that CAUSwave and Riggs committed fraud when they violated § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and § 17(a) of the Securities Act (15 U.S.C. § 77q(a)), (Counts I – IV). Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of securities, while § 17(a) of the Exchange Act prohibits fraud in the sale or offer of securities. These "antifraud provisions of

the Securities and Exchange Acts make it unlawful to use fraudulent practices and misrepresentations or omissions in connection with the offer, sale, or purchase of any security." SEC v. Gotchey, 981 F.2d 1251 (Table), 1992 WL 385284, *1 (4th Cir. Dec. 28, 1992).

Specifically, § 10(b) of the Exchange Act makes it unlawful, through the use of interstate commerce, "[t]o use or employ, in connection with the purchase or sale of any security . . . not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b-5 then makes it unlawful, through the use of interstate commerce, "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

Section 17(a) of the Securities Act similarly makes it unlawful, in the offer or sale of any securities, through interstate commerce, "(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances

8

under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).  The Supreme Court has defined device, scheme, or artifice by quoting Webster's International Dictionary.  Device is "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice". <u>Aaron v. SEC</u>, 446 U.S. 680, 696 n.13 (1980) (alteration in original).  Scheme is "[a] plan or program of something to be done; an enterprise; a project; as, a business scheme[, or] [a] crafty, unethical project". <u>Id.</u> (alterations in original).  Artifice is a "[c]rafty device; trickery; also, an artful stratagem or trick; artfulness; ingeniousness." <u>Id.</u> (alteration in original).

To prove a violation of § 10(b) and Rule 10b-5 thereunder of the Exchange Act, the SEC "must establish that the defendant '(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities.'" <u>SEC v. Pirate Inv'r LLC</u>, 580 F.3d 233, 239 (4th Cir. 2009); <u>see also</u> <u>SEC v. Haligiannis</u>, 470 F. Supp. 2d 373, 381 (S.D.N.Y. 2007) (providing the same elements, but including use of a fraudulent device along with the making of a false statement or omission of material fact).  "The standard for establishing a violation of Section 17(a) [of the Securities Act] is essentially the same . . . though no showing of scienter is required for . . . subsections (a)(2) or (a)(3)." <u>Haligiannis</u>, 470 F. Supp. 3d at 381 <u>cited in</u> <u>SEC v. Staples</u>, 55 F. Supp. 3d 831, 837 (D.S.C. 2014).

A fact is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Pirate Inv'r LLC, 580 F.3d at 240 (quoting Longman v. Food Lion, Inc., 197 F.3d 675, 683 (4th Cir. 1999)).

Scienter is the requisite intent and can be shown "by establishing that the speaker acted intentionally or recklessly". Id. at 241. "[T]he fact that a defendant publishes statements when in possession of facts suggesting that the statements are false is 'classic evidence of scienter.'" Id. at 243. The scienter of an individual defendant who is an authorized agent of a corporate defendant may be imputed to the corporation. See Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007) (evaluating the sufficiency of scienter allegations in a § 10b and Rule 10b-5 claim in an action against a corporate defendant pursuant to the Private Securities Litigation Reform Act).

While "fraudulent activity meets the 'in connection with' requirement of § 10(b) whenever it 'touches' or 'coincides' with a securities transaction", courts look to several factors for further guidance. Pirate Inv'r LLC, 580 F.3d at 244. These factors include, but are not limited to, "whether a securities sale was necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was such that it would necessarily involve trading in securities; (3) whether the defendant intended to induce a securities transaction; and (4) whether

material misrepresentations were 'disseminated to the public in a medium upon which a reasonable investor would rely'". Id.

The factual allegations, taken as true, establish that CAUSwave and Riggs violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder and § 17(a)(1) of the Securities Act.  The Investor Updates they sent to investors included statements that, (a) on November 23, 2011, CAUSwave had received long-awaited funds from its institutional investors when it had not, (b) on or before March 19, 2014, an institutional investor provided CAUSwave with a second tranche of bridge funding/operating capital when it had not, and (c) as of September 16, 2014, the investor's commitment to $70,000 per share at the time of buy-back remained firm when there were no funds from institutional investors nor any no firm commitment to buy back the shares.  These false or misleading statements were material because there was a substantial likelihood a reasonable purchaser of CAUSwave shares would consider each of these facts – institutional investment into CAUSwave, additional operating capital, and a firm commitment to buy back shares at $70,000 per share –  important in the decision to purchase the shares.

Likewise, CAUSwave and Riggs failed to update or correct prior statements made to investors regarding funding from institutional investors when they did not disclose that CAUSwave had paid approximately $500,000 to institutional investors from whom it was seeking investment and no institutional investor ever provided any investment funding.  These omissions were also material because a

11

reasonable purchaser of CAUSwave shares would have viewed the total mix of information made available to be significantly altered by the disclosure of the fact that the company had invested half of a million dollars with an institutional investor who not only failed to repay CAUSwave, but never invested any additional money in the company.

Furthermore, CAUSwave and Riggs acted with scienter because, not only was Riggs the drafter and signatory of the Investor Updates, but he, as CAUSwave's President and Chief Executive Officer, and CAUSwave were in a position to have known that the company had not received funds from any institutional investor.  If they did not know, they were reckless in not so knowing.  These false statements and omissions were made in connection with the sale of securities, as they were made in Investor Updates which were used to attract and offer shares to investors and prospective investors.  For these same reasons, CAUSwave and Riggs also violated §§ 17(a)(2) and 17(a)(3) of the Securities Act, where only a showing of negligence is required.

2.

The factual allegations, taken as true, also support the conclusion that CAUSwave and Riggs violated §§ 5(a) and 5(c) of the Securities Act (15 U.S.C. § 77e(a), (c)), (Count V).  "Sections 5(a) and (c) of the Securities Act . . . prohibit any person, directly or indirectly, from using the mails or any other means of interstate commerce to offer or sell a security unless it is registered with the Commission or is exempt from registration.  Scienter is not an element of a § 5

violation." Marker, 427 F. Supp. 2d at 589. "Once the Commission makes a prima facie case that the securities sold were not registered, the defendants bear the burden of demonstrating that they were entitled to an exemption. Id. at 589-90. The exemption claimed here is found in § 4(a)(5) of the Securities Act, which exempts "transactions involving offers or sales by an issuer to one or more accredited investors, if the aggregate offering price of an issue of securities offered in reliance of this paragraph does not exceed [$5,000,000], if there is no advertising or public solicitation in connection with the transaction by the issuer or anyone acting on the issuer's behalf, and if the issuer files such notice with the Commission as the Commission shall prescribe." 15 U.S.C. § 77d(a)(5). An accredited investor is defined in 17 C.F.R. § 230.501(a).

Here, from 2009 to March 2015, CAUSwave and Riggs continuously offered and sold shares of CAUSwave, including through Investor Updates – drafted, finalized, and signed by Riggs – emailed to investors, but it did not register any offerings of securities with the SEC. Although CAUSwave filed a Form D on June 2, 2014, signed by Riggs as President and Chief Executive Officer of CAUSwave, claiming an exemption under § 4(a)(5) of the Securities Act from registering its offering of securities, the form disclosed that the company had sold $4,427,575 of its securities to 298 non-accredited investors. CAUSwave did not restrict the sales of shares to investors from a single state nor did it ascertain whether potential purchasers were accredited investors. Instead, its investors resided in multiple states and the majority were non-accredited investors. Accordingly, CAUSwave

was not entitled to an exemption.  Both the company and Riggs violated §§ 5(a) and 5(c) of the Securities Act.

3.

Next, the facts, taken as true, also support the conclusion that Riggs aided and abetted CAUSwave's violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder, § 17(a) of the Securities Act, and §§ 5(a) and 5(c) of the Securities Act, (Count VI).  To prove an aiding and abetting violation of securities laws, the SEC must establish "(1) a primary violation by another person; (2) the aider and abettor's 'knowledge' of the primary violation; and (3) substantial assistance by the aider and abettor in the achievement or consummation of the primary violation." Schatz v. Rosenberg, 943 F.2d 485, 495 (4th Cir. 1991).  As has been established above, CAUSwave violated securities laws.  Riggs had knowledge of CAUSwave's violations, as he drafted, finalized, and signed the Investor Updates used in connection with the sale or offer of securities that contained intentional or reckless false statements or omissions of material fact.  The Investor Updates extolled the receipt of institutional investor funding when the company's bank account had no more than $100 and confirmed a commitment to buy back shares at $70,000 despite there being no firm commitment to do so.  Between September 2009 and March 2015, Riggs sent approximately $500,000 of CAUSwave's investor money to a purported institutional investor, but never received any money from that investor and never informed CAUSwave's investors.  Furthermore, as President and Chief Executive Officer of CAUSwave, Riggs sought a registration

14

exemption in June 2014 for which CAUSwave did not qualify, and, yet, it never registered its securities offerings with the SEC. Not only do these facts show Riggs's knowledge of CAUSwave's primary violations, but they show his substantial assistance in the achievement or consummation of those violations.

B.

The facts having supported violations of securities laws, the SEC asks that the Court permanently enjoin CAUSwave and Riggs from committing any future violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder, § 17(a) of the Securities Act, and §§ 5(a) and 5(c) of the Securities Act, order that CAUSwave and Riggs disgorge their ill-gotten gains and pay prejudgment interest on such amount, impose a civil penalty against CAUSwave and Riggs, and bar Riggs from serving as an officer or director of a public company.

1.

Section 20(b) of the Securities Act (15 U.S.C. § 77t(b)[2]) and § 21(d) of the Exchange Act (15 U.S.C. § 78u(d)(1)) "provide that upon a 'proper showing' the Commission may obtain a permanent injunction against any person who is engaged in a violation of any of the provisions of the securities acts or regulations." Marker, 427 F. Supp. 2d at 590. "The SEC need not prove irreparable injury or inadequacy of other remedies" and need only "demonstrate[] a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the

---

[2] The SEC incorrectly cites 15 U.S.C. § 78t(d). (SEC's Br. in Supp. at 14; see also SEC's Resp. to Ct. Order at 12 [Doc. #73].)

future." SEC v. Chapman, 826 F. Supp. 2d 847, 857 (D. Md. 2011). Factors

courts consider in this determination include:

> (1) the seriousness of the original violation; (2) the isolated or
> recurrent nature of the infraction; (3) the degree of scienter involved
> on the part of the defendant; (4) the defendant's recognition of his
> unlawful conduct and the sincerity of his assurances against future
> violations; and (5) the likelihood that the defendant's occupation will
> present opportunities for future violations.

Marker, 427 F. Supp. 2d at 590.

The application of these factors demonstrates a reasonable and substantial

likelihood that CAUSwave and Riggs, if not enjoined, will violate securities laws in

the future. As described above, between February 2009 and March 2015,

CAUSwave raised more than $6 million from investors. In part, it did so as a result

of information contained in Investor Updates that Riggs drafted, finalized, and

signed that intentionally or recklessly contained false statements or omissions of

material fact, including statements that CAUSwave received on November 23,

2011 funds from its institutional investors when its bank accounts totaled less

than $100, that CAUSwave had received a second tranche of operating capital

from an institutional investor when it had not and never did receive any funding

other than from general individual investors, and that there was a firm commitment

by an investor to buy back shares at $70,000 when there was no commitment.

Riggs also failed to disclose that he had given approximately $500,000 of

CAUSwave's investor money to a purported institutional investor from whom

CAUSwave never received any funding. This conduct was egregious and recurrent

over the course of several years. CAUSwave and Riggs, as its President and Chief Executive Officer, knew CAUSwave had not received investor funding when the company's combined bank account balances were less than $100 on the date the company allegedly received the funding. Likewise, CAUSwave and Riggs, as its President and Chief Executive Officer, knew the company had not received and did not receive money from institutional investors when they reported that they had. There is nothing before the Court to suggest that Riggs and, in turn, CAUSwave have recognized their unlawful conduct much less made assurances against future violations. A permanent injunction against CAUSwave and Riggs is warranted.

2.

The SEC also seeks an order that CAUSwave and Riggs disgorge their ill-gotten gains and pay prejudgment interest on such amount. Even after the SEC was given statutory authority in 1990 to seek monetary civil penalties, it has continued to pursue and courts have continued to order disgorgement. Kokesh v. SEC, ___ U.S. ___, 137 S. Ct. 1635, 1640 (2017); see also SEC v. Revolutions Med. Corp., No. 1:12-CV-3298-LMM, 2018 WL 2057357, at *3 (N.D. Ga. Mar. 16, 2018) (explaining why Kokesh has not "affected the SEC's legal authority to seek disgorgement"). "Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain'" and "requires that the defendant give up 'those gains . . . properly attributable to the defendant's interference with the claimant's legally protected rights.'" Kokesh, 137 S. Ct. at 1640. Courts have "ordered disgorgement in SEC enforcement proceedings in order to 'deprive . . . defendants

17

of their profits in order to remove any monetary reward for violating' securities laws and to 'protect the investing public by providing an effective deterrent to future violations.'" Id. "The district court has broad discretion in deciding whether to award disgorgement and in determining the amount to be disgorged." Marker, 427 F. Supp. 2d at 591. If a court orders disgorgement, it must make "a reasonable approximation of gains causally connected to the fraud." SEC v. Resnick, 604 F. Supp. 2d 773, 782 (D. Md. 2009). "It is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct. SEC v. Monterosso, 756 F.3d 1326, 1337 (11th Cir. 2014). However, disgorgement is subject to a five-year statute of limitations. Kokesh, 137 S. Ct. at 1645. "Accordingly, any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued." Id.

Here, the SEC filed its Complaint on December 16, 2015. Therefore, the only gains subject to disgorgement are those acquired on or after December 16, 2010. According to CAUSwave's bank records and its own spreadsheet, CAUSwave issued approximately 14,255 shares of stock in exchange for $8,553,000 in investor funds between December 16, 2010 and August 21, 2014. (Second Decl. of Elizabeth P. Skola ¶¶ 3, 4 (Sept. 19, 2018) [Doc. #73-1]; Spreadsheet, Ex. A to Second Decl. of Skola [Doc. #73-2].) In its motion, the SEC requests that CAUSwave be ordered to disgorge "no less than $6 million" even though it "appeared to have raised a total of approximately $9 million". (SEC's Br.

18

in Supp. at 16-17.)  The SEC's request of $6 million is a reasonable approximation of gains causally connected to the fraud, is supported by the evidence before the Court, and must be disgorged.  Because the facts, taken as true and explained in depth above, show CAUSwave and Riggs to have closely engaged in the securities violations together, they are jointly and severally liable for the amount to be disgorged.

In addition, those same bank records reveal payments, identified in various ways including as consulting fees, loans, expense reimbursements, and loan repayments, from CAUSwave to Riggs. (Second Decl. of Skola ¶ 6.)  Excluding expense reimbursements and loan repayments, Riggs received consulting fees, loans, pay, and other unexplained payments from CAUSwave of at least $1,160,000 from December 16, 2010 through April 2015. (Id.; Spreadsheet, Ex. B to Second Decl. of Skola [Doc. #73-3].)  These payments are also a reasonable approximation of additional gains causally connected to Riggs' fraud and must be disgorged.

"A decision to award prejudgment interest, and at what rate, . . . is in the broad discretion of the district court." Marker, 427 F. Supp. 2d at 592.  "In deciding whether to award prejudgment interest, the court considers the following factors:  (1) the need to fully compensate the wronged party for actual damages suffered; (2) the relative fairness of an award; (3) the remedial purpose of the statute involved; and (4) other general principles deemed relevant by the court." Id.

"Like disgorgement, an award of prejudgment interest is intended to prevent the defendant from profiting from his or her illegal conduct." Id.

In Kokesh, the Supreme Court determined that disgorgement was a penalty. 137 S. Ct. at 1643. In so doing, it addressed two principles underlying the definition of a penalty, one of which is that "a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner' – as opposed to compensating a victim for his loss." Id. at 1642. In addition, "disgorgement is imposed by the court as a consequence for violating . . . public laws", and the SEC "acts in the public interest, to remedy harm to the public at large, rather than standing in the shoes of particular injured parties." Id. at 1643. Not only is disgorgement punitive, but "in many cases, SEC disgorgement is not compensatory." Id. Applying the Marker factors and the Kokesh Court's analysis of disgorgement, this Court declines to award prejudgment interest.

3.

In addition, the SEC seeks the imposition of civil penalties against CAUSwave and Riggs pursuant to § 20(d)(2) of the Securities Act (15 U.S.C. § 77t(d)(2)) and § 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3)) equal to the gross pecuniary gain of CAUSwave and Riggs within the statute of limitations. (SEC's Resp. to Ct. Order at 10.) Specifically, the SEC requests a civil penalty of $1 million against Riggs and $4.2 million against CAUSwave, which, according to the SEC, "constitut[es] the [$6 million in] investor funds it received during the

statute of limitations, less those funds diverted to" Baldwin ($800,000) and Riggs ($1 million). (Id.) In so doing, the SEC recognizes that the $6 million and $1 million figures "are lower than the amount of actual investor funds that CAUSwave and Riggs actually received ($6 million vs[.] $8.55 million and $1 million vs. $1.16 million, respectively)", but notes that "it continues to rely on the lower numbers set forth in its earlier Motion for Default Judgment." (Id. at 10 n.4.)

Section 20(d)(2) of the Securities Act and § 21(d)(3) of the Exchange Act provide for civil penalties tiered to reflect the severity of the defendant's conduct. Relevant here is the third, and highest, tier which permits a penalty "not to exceed the greater of" a statutory amount adjusted for inflation or "the gross amount of pecuniary gain to such defendant" if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). "The statutes leave the amount to be imposed to the discretion of the district judge." Monterosso, 756 F.3d at 1338. However, the civil penalty is subject to the same five-year statute of limitations as disgorgement. Kokesh, 137 S. Ct. at 1640-41 (referring to 28 U.S.C. § 2462). Therefore, only the commission of fraud on or after December 16, 2010 is subject to a civil penalty.

CAUSwave's and Riggs's conduct was not only fraudulent, deceitful, manipulative, and deliberate or in reckless disregard of the law, but it also resulted in investments of over $6 million in the company during the statutory period, at

21

least creating a significant risk of substantial losses for those investors.  It is,

therefore, appropriate to impose a civil penalty of $4.2 million on CAUSwave and

$1 million on Riggs, conservative calculations of each Defendant's pecuniary gain.

4.

Finally, pursuant to § 20(e) of the Securities Act (15 U.S.C. § 77t(e)[3]) and

§ 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)), the SEC seeks to bar

Riggs permanently from serving as an officer or director of a public company.

(SEC's Br. in Supp. at 21-22; SEC's Resp. to Ct. Order at 11-12.)  These statutes

provide that a defendant who has violated 15 U.S.C. § 77q(a)(1) or 15 U.S.C. §

78j(b), as Riggs has, may be prohibited from acting as an officer or director of a

public company "if the person's conduct demonstrates unfitness to serve as an

officer or director of any such" company. 15 U.S.C. § 77t(e); 15 U.S.C. §

78u(d)(2).  Injunctive relief is appropriate if the SEC "demonstrates a reasonable

and substantial likelihood that the defendant, if not enjoined, will violate securities

laws in the future." Marker, 427 F. Supp. 2d at 590.  Factors to consider to

determine if a defendant should be enjoined include,

> among other things, the degree of scienter involved on the part of the
> defendant, the isolated or recurrent nature of the infraction, the
> defendant's recognition of the wrongful nature of his conduct, the
> sincerity of his assurances against future violations, and the likelihood,
> because of defendant's professional occupation, that future violations
> might occur.

---

[3] The SEC incorrectly cites 15 U.S.C. § 77t(d). (SEC's Br. in Supp. at 21.)

<u>SEC v. Lawbaugh</u>, 359 F. Supp. 2d 418, 424-25 (D. Md. 2005) (quoting <u>SEC v. Bonastia</u>, 614 F.2d 908, 912 (3d Cir. 1980)).

Riggs' conduct from early 2009 through the spring of 2015, as detailed earlier, support permanently enjoining him from serving as an officer or director of a public company, particularly in light of his conduct defending against the instant action. In the course of defending against this action, Riggs' conduct was sanctioned by having his Answer stricken and default entered against him, sanctions recognized by the Court as among "the most severe". (<u>See</u> Order & Recommendation at 4 (Nov. 13, 2017 [Doc. #56]), <u>adopted with modification</u>, Order (Mar. 7, 2018) [Doc. #62].) Riggs has repeatedly argued against the Magistrate Judge's jurisdiction to determine issues before her, even after this Court explained to Riggs the law supporting the Magistrate Judge's jurisdiction. (<u>See</u> Docs. #50, 52, 60, 62, 65.) There is nothing assuring to the Court that Riggs understands the egregiousness of his securities violations or takes responsibility for his actions. Accordingly, an injunction permanently barring him from serving as an officer of director of a public company is warranted.

IV.

For the reasons explained herein, IT IS HEREBY ORDERED that Defendant Jeffrey L. Riggs's "Notice of Motion to Vacate Order for Default Entered Against Him" [Doc. # 65] be DENIED, Plaintiff Securities and Exchange Commission's Motion for Default Judgment as to Defendants CAUSwave, Inc. and Jeffrey L. Riggs [Doc. #67] be GRANTED, and the Securities and Exchange Commission's

23

Motion to Dismiss with Prejudice All Claims Against Defendant Diane R. Baldwin [Doc. #74] be GRANTED;

IT IS FURTHER ORDERED that CAUSwave, Inc. disgorge $6 million;

IT IS FURTHER ORDERED that Jeffrey L. Riggs disgorge $1 million;

IT IS FURTHER ORDERED that a civil penalty of $4.2 million be imposed against CAUSwave, Inc.;

IT IS FURTHER ORDERED that a civil penalty of $1 million be imposed against Jeffrey L. Riggs;

IT IS FURTHER ORDERED that CAUSwave, Inc. be permanently enjoined from committing any future violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder, § 17(a) of the Securities Act, and §§ 5(a) and 5(c) of the Securities Act.

IT IS FURTHER ORDERED that Jeffrey L. Riggs be permanently enjoined from committing any future violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder, § 17(a) of the Securities Act, and §§ 5(a) and 5(c) of the Securities Act.

IT IS FURTHER ORDERED that Jeffrey L. Riggs be permanently enjoined from serving as an officer or director of a public company.

IT IS FURTHER ORDERED that this action be dismissed. A judgment

dismissing this action will be entered contemporaneously with this Memorandum

Opinion and Order.

      This the 26th day of September, 2018.


/s/ N. Carlton Tilley, Jr.
Senior United States District Judge
